**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOSELYN RAMOS, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | No. 21-cv-03192 |
| v. | Hon. Sharon Johnson Coleman |
| PUMA NORTH AMERICA, INC., a Delaware corporation, | |
| *Defendant*. | |

**PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF
<u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ......................................... 2

    A.    Illinois' Biometric Information Privacy Act ........................................ 2

    B.    Plaintiff's Allegations and Defendant's Timekeeping System .......... 4

    C.    Litigation, Negotiation, and Settlement ............................................. 5

III.   TERMS OF THE SETTLEMENT AGREEMENT .......................................... 7

    A.    Class Definition ...................................................................................... 7

    B.    Settlement Payments ............................................................................. 7

    C.    Prospective Relief .................................................................................. 8

    D.    Payment of Settlement Notice and Administrative Costs ................. 8

    E.    Payment of Attorneys' Fees, Costs, and Incentive Award ............... 9

    F.    Release of Liability ................................................................................ 9

IV.   THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES .......................................................................... 10

    A.    The Numerosity Requirement is Satisfied ....................................... 10

    B.    Common Issues of Fact and Law Predominate ................................ 11

    C.    The Typicality Requirement is Satisfied ........................................... 12

    D.    The Adequacy Requirement is Satisfied ........................................... 13

    E.    A Class Action is a Superior Method of Resolving the Controversy ............. 16

    F.    The Class is Ascertainable .................................................................. 17

V.     PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL ..... 18

VI.   THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL ............................................................................................... 19

**A.** **Plaintiff Joselyn Ramos and Proposed Class Counsel Have Adequately Represented the Settlement Class** ....................................................................20

**B.** **The Settlement Was Reached as a Result of Arm's-Length Negotiations Between the Parties** .........................................................................................24

**C.** **The Settlement Treats All Settlement Class Members Equally** ...................26

**D.** **The Relief Secured for the Settlement Class Is Adequate and Warrants Approval** ........................................................................................................27

   **1.** **The cost, risk, and delay of further litigation compared to the Settlement's benefits favors final approval** ...........................................27

   **2.** **The method of distributing relief to the Settlement Class Members is effective and supports preliminary approval** ........................................30

   **3.** **The terms of the requested attorneys' fees are reasonable** .................31

**VII.** **THE PROPOSED NOTICE PLAN SHOULD BE APPROVED IN FORM AND SUBSTANCE** .......................................................................................................33

**VIII.** **CONCLUSION** ....................................................................................................34

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................10, 16

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
  568 U.S. 455 (2013)....................................................................................................10

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)....................................................................................................33

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)....................................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)....................................................................................................11

**United States Circuit Court of Appeals Cases**

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ......................................................................................10

*Beaton v. SpeedyPC Software*,
  907 F.3d 1018 (7th Cir. 2018) ....................................................................................13

*Bell v. PNC Bank, Nat'l Ass'n*,
  800 F.3d 360 (7th Cir. 2015) ......................................................................................11

*Gomez v. St. Vincent Health, Inc.*,
  649 F.3d 583 (7th Cir. 2011) ......................................................................................18

*In re Burlington N. Santa Fe Ry. Co.*,
  606 F.3d 379, 380 (7th Cir. 2010) ................................................................................5

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ...........................................................................10, 17, 18

*Mulvania v. Sheriff of Rock Island Cnty.*,
  850 F.3d 849 (7th Cir. 2017) ......................................................................................10

*Patel v. Facebook, Inc.*,
  932 F.3d 1264 (9th Cir. 2019) ....................................................................................14

*Retired Chi. Police Ass'n v. City of Chi.*,
  7 F.3d 584 (7th Cir. 1993) ........................................................................13

*Sosa v. Onfido, Inc.*,
  8 F.4th 631 (7th Cir. 2021) ......................................................................15

*Spano v. The Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ...................................................................12

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ...................................................................11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
  463 F.3d 646 (7th Cir. 2006) ...................................................................19

*U.S. v. Dish Network L.L.C.*,
  954 F.3d 970 (7th Cir. 2020) ...................................................................29

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022) ..................................................................29

*Williams v. Rohm & Haas Pension Plan*,
  658 F.3d 629 (7th Cir. 2011) ...................................................................32

**<u>United States District Court Cases</u>**

*Adkins v. Facebook, Inc.*,
  No. 18-cv-05982-WHA (N.D. Cal. May 6, 2021) .....................................23
  No. 18-cv-05982-WHA (N.D. Cal. Jul. 13, 2021) ....................................23

*Alvarado v. Int'l Laser Prods., Inc.*,
  No. 18-cv-7756 (N.D. Ill. Jan. 24, 2020) .................................................32

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
  No. 07 C 2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) ...........................21

*Bernal v. NRA Grp. LLC*,
  318 F.R.D. 64 (N.D. Ill. 2016) .................................................................17

*Cornejo v. Amcor Rigid Plastics USA, LLC*,
  No. 18-cv-07018 (N.D. Ill. Sept. 10, 2020) .....................................1, 23, 31, 32

*Dixon v. Washington & Jane Smith Cmty.-Beverly*,
  No. 17-cv-8033 (N.D. Ill. May 31, 2018) .................................................27

*Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374,
    No. 92 C 4374, 1995 WL 17009594  (N.D. Ill. Oct. 10, 1995) ........................................28

*Gumm v. Ford*,
    No. 5:15-cv-41-MTT, 2019 WL 479506 (M.D. Ga. Jan. 17, 2019) ................................20

*Hale v. State Farm Mut. Auto. Ins. Co.*,
    No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)....................................19

*Hudson v. Libre Tech., Inc.*,
    No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060 (S.D. Cal. 2020) ...............................29

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010)....................................................................................21

*In re AT & T Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011).............................................................................30

*In re Facebook Biometric Info. Priv. Litig.*,
    326 F.R.D. 535 (N.D. Cal. 2018)...................................................................................16

*In re Facebook Biometric Info. Priv. Litig.*,
    No. 15-cv-3747-JD, 2021 WL 757025 (N.D. Cal. Feb. 26, 2021) ...................................15

*In re Google LLC Street View Elec. Commc'ns Litig.*,
    No. 10-md-02184-CRB, 2020 WL 1288377 (N.D. Cal. Mar. 18, 2020)..........................22

*Kaufman v. Am. Express Travel Related Servs., Co.*,
    No. 07-CV-1707, 2016 WL 806546 (N.D. Ill. Mar. 2, 2016)...........................................22

*Lopez-McNear v. Superior Health Linens, LLC*,
    No. 19-cv-2390 (N.D. Ill. Apr. 27, 2021) ......................................................................27

*Martinez v. Nandos Rest. Grp., Inc.*,
    No. 19-cv-07012 (N.D. Ill. Oct. 27, 2020) ................................................................1, 27

*Montgomery v. Peri Framework Sys., Inc.*,
    No. 20-cv-07771 (N.D. Ill. Nov. 9, 2021) ......................................................................23

*Muir v. Nature's Bounty (DE), Inc.*,
    No. 15 C 9835, 2018 WL 3647115 (N.D. Ill. Aug. 1, 2018)............................................12

*Neals v. ParTech, Inc.*,
    No. 19-cv-05660 (N.D. Ill. July 20, 2022)......................................................................32

*Osada v. Experian Info. Sols., Inc.*,
  290 F.R.D. 485 (N.D. Ill. 2012)................................................................14

*Quiroz v. Revenue Prod. Mgmt., Inc.*,
  252 F.R.D. 438 (N.D. Ill. 2008)................................................................14

*Rogers v. BNSF Ry. Co.*,
  No. 19 C 3083, 2022 WL 854348 (N.D. Ill. Mar. 22, 2022) ............................17

*Schulte v. Fifth Third Bank*,
  805 F. Supp. 2d 560 (N.D. Ill. 2011) ........................................................30

*Schulte v. Fifth Third Bank*,
  No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. Sept. 10, 2010) ......................25

*Snyder v. Ocwen Loan Servicing, LLC*,
  No. 14 c 8461, 2019 WL 2103379 (N.D. Ill. May 14, 2019) ....................20, 25

*Starr v. Chi. Cut Steakhouse*,
  75 F. Supp. 3d 859 (N.D. Ill. 2014) ..........................................................13

*Toney v. Quality Res., Inc.*,
  323 F.R.D. 567 (N.D. Ill. 2018)................................................................18

*Wright v. Nationstar Mortg. LLC*,
  No. 14 C 10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016)........................24

*Young v. Rolling in the Dough, Inc.*,
  No. 17-cv-07825, 2020 WL 969616 (N.D. Ill. Feb. 27, 2020)........................25

*Ziemack v. Centel Corp.*,
  163 F.R.D. 530 (N.D. Ill. 1995)................................................................13

**State Supreme Court Cases**

*Cothron v. White Castle System, Inc.*,
  2023 IL 128004................................................................................28

*McDonald v. Symphony Bronzeville Park LLC*,
  2022 IL 126511................................................................................15

*Rosenbach v. Six Flags Ent. Corp.*,
  2019 IL 123186..................................................................................4

*Tims v. Black Horse Carriers, Inc.*,
  2023 IL 127801................................................................................28

**State Appellate Court Cases**

*Rottner v. Palm Beach Tan, Inc.*,
    2019 IL App (1st) 180691-U ............................................................................... 15

*Sekura v. Krishna Schaumburg Tan, Inc.*,
    2018 IL App (1st) 180175 ................................................................................... 15

**State Circuit Court Cases**

*Carroll v. Crème de la Crème, Inc.*,
    2017-CH-01624 (Cir. Ct. Cook Cnty.). ............................................................... 23

*Kane v. ConTech Lighting*,
    2018-CH-12194 (Cir. Ct. Cook Cnty.) ................................................................ 23

*Lark, et al v. McDonald's USA, LLC, et al.*,
    No. 17-L-559 (Cir. Ct. St. Clair Cnty.) ............................................................... 32

*Licata v. Facebook, Inc.*,
    2015-CH-05427 (Cir. Ct. Cook Cnty.). ............................................................... 14

*Marshall v. Lifetime Fitness, Inc.*,
    2017-CH-14262 (Cir. Ct. Cook Cnty.). ................................................... 1, 23, 32

*Palacios v. H&M Hennes & Mauritz, LP*,
    No. 18-CH-16030 (Cir. Ct. Cook Cnty) ............................................................. 29

*Prelipceanu v. Jumio Corp.*,
    2018-CH-15883 (Cir. Ct. Cook Cnty.). ............................................................... 32

*Sekura v. L.A. Tan Enters., Inc.*,
    2015-CH-16694 (Cir. Ct. Cook Cnty.). ............................................................... 15

*Zhirovetskiy v. Zayo Grp., LLC*,
    2017-CH-09323 (Cir. Ct. Cook Cnty.) ................................................................ 23

**Miscellaneous Authority**

740 ILCS 14 ...................................................................................................... *passim*

Fed. R. Civ. Proc. 23 ........................................................................................ *passim*

Ill. House Transcript, 2008 Reg. Sess. No. 276 .............................................................. 3

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
Law360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf ........................................................................................... 15

Diana Novak Jones, *Illinois Powerhouse: Edelson PC*,
Law360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc ................................................................................................ 15

Lauraann Wood, *Illinois Powerhouse: Edelson*,
Law360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson ............................................................................................................ 15

*Law360 Names Practice Groups of the Year*,
Law360 (Jan. 11, 2023), https://www.law360.com/articles/1562154 ............................15

Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*,
Venture Beat, available at http://goo.gl/xT8HZW ........................................................3

Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*,
Consumerist, available at https://goo.gl/rKJ8oP ............................................................3

Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*
Law360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-privacy-group-of-the-year-edelson ...............................................................................15

1 Newberg on Class Actions
§ 3:56 (5th ed. 2011) ..................................................................................................18

2 Newberg on Class Actions
§ 4:69 (6th ed. 2022) ..................................................................................................16
§ 4:70 (6th ed. 2022) ..................................................................................................17

4 Newberg on Class Actions
§ 13:53 (5th ed. 2011) ................................................................................................30

## I. INTRODUCTION

Plaintiff Joselyn Ramos ("Plaintiff") worked for Defendant PUMA North America, Inc. ("Puma" or "Defendant") at its retail stores in the Chicagoland area. She brought this class action lawsuit alleging that Puma violated the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.*, by collecting and storing her fingerprint data through the use of a finger-scanning timekeeping system without providing the requisite disclosures or obtaining informed written consent. After exchanging formal and informal discovery, briefing Puma's motion to stay, and months of arm's-length negotiations, the Parties have reached a class-wide settlement that provides top-of-the-market relief for the Settlement Class.[1]

Over the last several years, there have dozens of BIPA class action settlements with employers who allegedly collected their workers' biometric data and the relief to the class has had a wide range. Some have provided the class needless credit monitoring and required class members to submit claims to receive relief that is capped at a certain amount, with the inevitable remaining settlement funds reverting to the defendant. *E.g.*, *Marshall v. Lifetime Fitness, Inc.*, 2017-CH-14262 (Cir. Ct. Cook Cnty. July 30, 2019) ($270 per claimant with credit monitoring, with unclaimed funds reverting to defendant). In the leading settlements in the employment context, however, the settlement secures significant monetary relief sent directly to the class—with no need for a claims process and without reversion to the defendant. *E.g.*, *Cornejo v. Amcor Rigid Plastics USA, LLC*, No. 18-cv-07018, dkt. 57 (N.D. Ill. Sept. 10, 2020) ($175,000 non-reversionary fund for 125 class members with direct checks); *Martinez v. Nando's Rest. Grp., Inc.*, No. 19-cv-07012 (N.D. Ill. Oct. 27, 2020) ($1,787,000 non-reversionary fund for 1,787 class members with direct checks).

---

[1]     Unless otherwise specified, all capitalized terms are defined in the Class Action Settlement Agreement (the "Agreement" or "Settlement"), which is attached as Exhibit 1.

This Settlement is an extraordinary example of that last category. Under its terms, Puma has agreed to pay $177,800.00 into a non-reversionary Settlement Fund to be distributed to the Settlement Class comprised of 127 current and former employees. After fees and costs are deducted, each Class Member will receive a Settlement Payment for approximately $740 (via a direct check in the mail or an electronic payment method of their choosing, like Venmo, PayPal, or Zelle), without ever having to file a claim form—a rarity in class action settlements. The Settlement also secures Puma's agreement to comply with BIPA going forward, by obtaining informed written consent from individuals who work at its Illinois facilities before any biometric data is ever collected, establishing and maintaining a BIPA-compliant retention and destruction policy (to the extent Puma uses biometric timekeeping technology going forward), deleting individuals' biometric data in accordance with that policy, and destroying the biometric data of any former Illinois employees in Puma's possession.

Given the relief proposed by the Settlement Agreement, the Court should not hesitate to find that the Settlement is well within the range of possible approval. Accordingly, Plaintiff respectfully requests that the Court grant her motion for preliminary approval in its entirety, certify the proposed Settlement Class, appoint her attorneys as Class Counsel, direct that the proposed Notice be disseminated to the Settlement Class, and set a Final Approval Hearing.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Illinois' Biometric Information Privacy Act

A brief history and overview of BIPA gives further context to the reasonableness of the proposed Settlement. In the early 2000s, a company called Pay By Touch began installing fingerprint-based checkout terminals at grocery stores and gas stations in major retailers throughout Illinois to facilitate consumer transactions. (Complaint, ("Compl."), dkt. 1-1 ¶¶ 11–12.) The premise was simple: swipe your credit card and let the machine scan your index finger,

and the next time you buy groceries or gas, you won't need to bring your wallet—you'll just need to provide your fingerprint. But by the end of 2007, Pay By Touch had filed for bankruptcy. (*Id.* ¶ 12.) When Solidus, Pay By Touch's parent company, began shopping its database of Illinois consumers' fingerprints as an asset to its creditors, a public outcry erupted.[2] Though the bankruptcy court eventually ordered Pay By Touch to destroy its database of fingerprints (and their ties to credit card numbers), the Illinois Legislature took note of the grave dangers posed by the irresponsible collection and storage of biometric data without any notice, consent, or other protections. *See* Ill. House Transcript, 2008 Reg. Sess. No. 276.

Recognizing the "very serious need" to protect Illinois citizens' biometric data—which includes retina scans, fingerprints, voiceprints, and scans of hand or face geometry—the Illinois legislature unanimously passed BIPA in 2008 to provide individuals recourse when companies fail to appropriately handle their biometric data in accordance with the statute. (*See* Compl. ¶ 13; 740 ILCS 14/5.) Thus, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

> (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored;
>
> (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> (3) receives a written release executed by the subject of the biometric identifier or biometric information . . . ."

---

[2]    *See, e.g.*, Meg Marco, *Creepy Fingerprint Pay Processing Company Shuts Down*, CONSUMERIST, available at https://goo.gl/rKJ8oP (last accessed April 14, 2023); Matt Marshall, *Pay By Touch In Trouble, Founder Filing For Bankruptcy*, VENTURE BEAT, available at http://goo.gl/xT8HZW (last accessed April 14, 2023).

740 ILCS 14/15(b). BIPA also establishes standards for how companies must handle Illinois consumers' biometric data, requiring companies to develop and comply with a written policy establishing a retention schedule and guidelines for permanently destroying biometric data. 740 ILCS 14/15(a). To enforce the statute, BIPA provides a civil private right of action and allows for the recovery of statutory damages in the amount of $1,000 for negligent violations—or $5,000 for willful violations—plus costs and reasonable attorneys' fees. *See* 740 ILCS 14/20.

As the Illinois Supreme Court assessed the legislature's intent in passing BIPA, the statute:

> vests in individuals and customers the right to control their biometric information by requiring notice before collection and giving them the power to say no by withholding consent. . . . These procedural protections are particularly crucial in our digital world because technology now permits the wholesale collection and storage of an individual's unique biometric identifiers—identifiers that cannot be changed if compromised or misused. When a private entity fails to adhere to the statutory procedures . . . the right of the individual to maintain her biometric privacy vanishes into thin air. The precise harm the Illinois legislature sought to prevent is then realized. This is no mere technicality. The injury is real and significant.

*Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186 ¶ 34 (internal citations and quotations omitted).

### B.    Plaintiff's Allegations and Defendant's Timekeeping System

Plaintiff claims that Puma used a fingerprint scanning system to monitor its employees' working hours at the Puma locations she worked at in the Chicagoland area. She alleges that when she first began working for Puma, the company required her—and all other new employees—to scan her fingerprint to enroll her in Puma's employee fingerprint database, and subsequently use her fingerprint in order to clock in and out of work. (Compl. ¶¶ 21–22, 26–27). Plaintiff alleges that Puma failed to comply with BIPA's requirements when Puma collected her fingerprints. (*Id.* ¶¶ 22–23, 28–30.) Plaintiff alleges that Puma violated BIPA by collecting,

using, and storing its employees' biometric information without obtaining informed consent prior to scanning their fingerprints. (*Id.* ¶¶ 28, 30, 43, 50–52.) Plaintiff further alleges that Puma failed to develop or comply with any written policy for permanently destroying employees' biometric information. (*Id.* ¶¶ 25, 43.) Defendant denies that it has engaged in any wrongdoing or that it violated any laws. (*See* dkt 32.)

## C.    Litigation, Negotiation, and Settlement

Plaintiff Joselyn Ramos originally filed this putative class action on March 1, 2021, against Defendant Puma in the Circuit Court of Cook County, Illinois, seeking redress on behalf of herself and a class of employees for Puma's alleged BIPA violations. After Defendant removed the case to this Court, the Parties then began to discuss the potential for a class-wide resolution in July of 2021.[3] (Declaration of Schuyler Ufkes ("Ufkes Decl."), at ¶ 3, attached hereto as Exhibit 2.) As part of those discussions, Defendant provided Plaintiff informal discovery, including the approximate size and composition of the putative class and the notice and consent forms related to biometric data that Puma had created and implemented. (*Id.*) Puma then answered Plaintiff's complaint, denying Plaintiff's allegations and raising twenty-seven (27) affirmative defenses. (Dkt. 32.)

Plaintiff then initiated formal written discovery by serving Defendant with her first set of interrogatories and requests for production on September 23, 2021, to which Defendant

---

[3]    This Court continues to have federal subject matter jurisdiction, because jurisdiction attaches at the time of removal. *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 380 (7th Cir. 2010). In its removal papers, Puma submitted that the amount in controversy exceeded $5,000,000 for purposes of CAFA jurisdiction, (dkt. 1 ¶¶ 19–20), which was plausible at that time because the number of times Puma allegedly violated BIPA across the putative class wasn't yet determined.

responded on December 3, 2021. (Ufkes Decl. ¶ 4.) Meanwhile, the Parties also exchanged initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1). (*Id.* ¶ 5.)

On October 28, 2021, Puma moved to stay all proceedings, pending rulings in appeals in four separate BIPA cases: (1) *McDonald v. Symphony Bronzeville*, which concerned whether the exclusive remedies provision of the Illinois Workers' Compensation Act bars employee BIPA claims; (2) *Tims v. Blackhorse Carriers, Inc.* and *Marion v. Ring Container Technologies, LLC*, both of which concerned the applicable statute of limitations for BIPA claims; and (3) *Cothron v. White Castle System, Inc.*, which concerned whether a BIPA claim accrues each time an entity collects or discloses an individual's biometric data in violation of the statute or only the first time. (Dkt. 35.) Plaintiff filed a brief in opposition. (Dkt. 38.) Ultimately, on November 22, 2021, the Court granted the stay pending decisions in *McDonald, Tims*, and *Cothron*. (Dkt. 39.)

Despite the stay, the Parties revisited their settlement discussions in April 2022, which led to the Parties agreeing to participate in a formal mediation session with the Honorable James F. Holderman (Ret.) of JAMS in Chicago on May 12, 2022. (Ufkes Decl. ¶ 6.) Despite their efforts, the Parties were unable reach a resolution at the mediation. (*Id.*)

Settlement discussions stalled until late January of 2023 when the Parties learned that the Illinois Supreme Court was scheduled to issue a decision in *Tims* on February 2, 2023, which would clarify the applicable statute of limitations for BIPA claims and, in turn, the scope of this case. (*Id.* ¶ 7.) As a result, the Parties revisited their settlement discussions once again and, after significant arm's-length negotiations, reached an agreement in principle on the eve of the *Tims* decision. (*Id.*) The Parties continued to negotiate the remaining material terms of the settlement over the next several days, and ultimately executed a binding Memorandum of Understanding on February 6, 2023, which set forth the material terms of the settlement. (*Id.*) The Parties then

prepared and negotiated the final terms of the settlement over the next several weeks, resulting in the final executed Settlement Agreement now before the Court. (*Id.*)

## III.   TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement are set forth in the Class Action Settlement Agreement, and are briefly summarized here:

### A.   Class Definition

The proposed Settlement Class includes all current and former employees of Puma who used a finger scanner at a Puma facility in the State of Illinois between March 1, 2016 and the date of the Preliminary Approval Order. (Agreement § 1.22.) Excluded from the Settlement Class are: (1) persons who executed Defendant's consent form related to the collection, use, disclosure, retention, and destruction of biometric data prior to their first use of Defendant's timekeeping system, (2) persons who have signed an arbitration agreement with Defendant, (3) any Judge or Magistrate presiding over this action and members of their families, (4) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, (5) persons who properly execute and file a timely request for exclusion from the Settlement Class, and (6) the legal representatives, successors, or assigns of any such excluded persons. (*Id.*)

### B.   Settlement Payments

The Settlement provides that Puma will create a $177,800.00 non reversionary Settlement Fund. After paying all Settlement Administration Expenses, costs, attorneys' fees, and any incentive award from the Settlement Fund, the Settlement Administrator will distribute Settlement Payments *pro rata* in the amount of approximately $740 directly to *all* 127 class members (assuming no one opts out), without the need for a claims process. (*Id.* §§ 1.24, 2.1(a).)

Any uncashed checks or electronic payments unable to be processed within 180 days of

issuance will, subject to Court approval, first be re-distributed to Settlement Class Members who cashed their checks or successfully received their electronic payments, if feasible and in the interests of the Settlement Class. If redistribution is not feasible, or if residual funds remain after redistribution, such funds will be distributed to Legal Aid Chicago, earmarked to support its Workers' Rights Practice Group—an organization that "works to ensure that low-wage Chicagoland workers receive the equitable support that they deserve" including by helping employees "receive unemployment insurance benefits, receive wage claims, fight employment discrimination and wrongful termination, and more"—as *cy pres* recipient, or any alternative *cy pres* recipient the Court may select. (*Id.* § 2.1(e).) No portion of the Settlement Fund will revert back to Defendant or any other Released Party. (*Id.* § 1.24.)

### C. Prospective Relief

Defendant has agreed that, to the extent it collects any biometric data going forward, it will first obtain informed written consent, establish and maintain a BIPA-compliant retention and deletion policy for biometric data and make it publicly available, destroy biometric data pursuant to that policy, and destroy all biometric data within its possession collected from former employees in Illinois. (*Id.* § 2.2.)

### D. Payment of Settlement Notice and Administrative Costs

Defendant has agreed to pay from the Settlement Fund all expenses incurred by the Settlement Administrator in, or relating to, administering the Settlement, providing Notice, creating and maintaining the Settlement Website, dispersing Settlement Payments, and any other related expenses. (*Id.* § 1.20.)

### E. Payment of Attorneys' Fees, Costs, and Incentive Award

Defendant has agreed that Class Counsel is entitled to reasonable attorneys' fees and unreimbursed expenses in an amount to be determined by the Court by petition. (*Id.* § 8.1.) Proposed Class Counsel has agreed to limit its request for fees to 35% of the Settlement Fund, with no consideration from Defendant and no "clear-sailing agreement" so Defendant may challenge the amount requested. (*Id.*) There's also no "kicker" clause, meaning any difference between the amount sought in attorneys' fees and expenses and the amount awarded will remain in the Settlement Fund and will be distributed to Class Members—not to Defendant. (*Id.*) Defendant has also agreed to pay Plaintiff an incentive award in the amount of $5,000 from the Settlement Fund, subject to Court approval, in recognition of her efforts as Class Representative. (*Id.* § 8.2.) Plaintiff will move for these payments via a separate request after preliminary approval and prior to the deadline to object to the Settlement.

### F. Release of Liability

In exchange for the relief described above, the Settlement Class Members will release Defendant, its affiliated companies, subsidiaries, shareholders, officers, directors, employees, agents, servants, registered representatives, attorneys, insurers, reinsurers, including ACE American Insurance Company, successors, and assigns from any and all past and present claims arising from Defendant's alleged collection, retention, use, possession, capture, purchase, receipt through trade, obtainment, sale, profit from, disclosure, redisclosure, dissemination, storage, transmittal, and/or protection from disclosure of alleged biometric information or biometric identifiers through the use of finger-scanning time clocks at Defendant's Illinois facilities, including any violation of BIPA. (*Id.* §§ 1.17–1.19, 3.1.) Kronos Incorporated, and its parents and subsidiaries, are explicitly excluded from the Settlement and release. (*Id.* § 1.8)

## IV.     THE PROPOSED SETTLEMENT CLASS CAN BE CERTIFIED FOR SETTLEMENT PURPOSES

Before the Court can preliminarily approve the proposed Settlement and direct notice to the Settlement Class, it must find that the Court "will likely be able to…certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(ii); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). District courts are given broad discretion to determine whether class certification is appropriate. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

To merit certification, the Settlement Class must first satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *see Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013). Additionally, because the Settlement provides for monetary relief, the Settlement Class must also satisfy the requirements of Rule 23(b)(3): that (i) common questions of law or fact predominate over individual issues and (ii) a class action is the superior device to resolve the claims. *Amchem*, 521 U.S. at 615–16. Finally, Rule 23 contains an implicit "ascertainability" requirement "that classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). As explained below, the proposed Settlement Class satisfies all the Rule 23(a) and 23(b)(3) prerequisites as well as Rule 23's implicit ascertainability requirement.

### A.     The Numerosity Requirement is Satisfied

A class action may proceed when the proposed class "is so numerous as to render joinder impractical." Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). Here, the proposed Settlement Class contains 127 individuals. (*See* Declaration of Tiffany Paquette, ("Paquett Decl."), attached hereto as Exhibit 3, at ¶ 4.) The numerosity requirement is satisfied.

**B.** **Common Issues of Fact and Law Predominate.**

Rule 23(a)(2) instructs that a class may be certified only if there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Where, as here, the class seeks monetary relief, the common questions must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). *See also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374 (7th Cir. 2015) ("[T]he question of commonality and predominance overlap in ways that make them difficult to analyze separately…"). Common questions are those "capable of class-wide resolution" such "that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim." *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "What matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotations omitted). As such, "[t]he critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (internal quotations omitted). When "the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found." *Id.* But when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members," class treatment is appropriate. *Id.*

Here, common issues of law and fact certainly predominate. Plaintiff's and the proposed Settlement Class's claims are based upon the same common contention and course of alleged conduct by Puma: that it allegedly violated BIPA by collecting and storing the Settlement Class's biometric data without first obtaining informed written consent or establishing a publicly available retention policy. (*See* Compl. ¶¶ 19–23, 28–30.) This contention raises several issues of law and fact common to the Settlement Class, including: (1) whether the finger scan information

collected, captured, or otherwise obtained from Plaintiff and the Settlement Class constitutes "biometric identifiers" or "biometric information" (as defined by 740 ILCS 14/10) subject to BIPA; (2) whether Puma properly informed Plaintiff and the Settlement Class of its purposes for collecting, using, and storing their biometric data, 740 ILCS 14/15(b); (3) whether Puma obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's and the Settlement's Class's biometric data, *id.*; (4) whether Puma complied with any written policy that established a retention schedule and guidelines for permanently destroying biometric data, 740 ILCS 14/15(a); (5) whether Puma used Plaintiff's and the Settlement Class's finger scan data to identify them, and (6) whether Puma's alleged violations of BIPA were committed negligently or recklessly, 740 ILCS 14/20 (providing $1,000 in damages per negligent violation or $5,000 in damages per reckless violation).

Because answering each of these questions would resolve all Class Members' claims in one stroke, and no individualized issues (to the extent there are any) could defeat this overwhelming commonality, predominance is satisfied. *See Muir v. Nature's Bounty (DE), Inc.*, No. 15 C 9835, 2018 WL 3647115, at *9 (N.D. Ill. Aug. 1, 2018) (predominance requires that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating individual issues.") (internal quotations omitted).

**C.    The Typicality Requirement is Satisfied.**

The next prerequisite—typicality—requires that a class representative has claims that are typical of those of the putative class members. Typicality examines whether there is "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). Where a named plaintiff's claim "arise[s] from the same

events or course of conduct that gives rise to the putative class members' claims," typicality is satisfied. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). In other words, when the basis of the suit is the defendant's systematic business practices toward the named plaintiff and the members of the proposed class, typicality is generally satisfied.

Here, there is nothing separating Plaintiff's BIPA claim from that of any other member of the Settlement Class. She alleges that, like every other member, she (i) was an employee of Puma, (ii) used a finger scanner at Puma's facilities in Illinois to track her time, (iii) was identified by Puma's timeclock system each time she scanned her finger, (iv) was not given any BIPA-compliant notices, disclosures, or requests for consent from Puma prior to first scanning her finger, and (v) did not sign a written release authorizing Puma's collection of her biometric data prior to first scanning her finger. (*See* Compl. ¶¶ 20–23, 25–30.)

Because she was subject to the same conduct and practices by Puma as everyone else in the Settlement Class, Plaintiff's BIPA claims will "stand or fall on the same facts as the claims of the putative class members." *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 534 (N.D. Ill. 1995). Plaintiff's claims are therefore typical of the Settlement Class's claims.

### D. The Adequacy Requirement is Satisfied.

The final Rule 23(a) prerequisite—adequacy—requires a finding that the class representative has and will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is twofold: "'adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s]' of the class members." *Starr v. Chi. Cut Steakhouse*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993)). To assess adequacy, courts examine whether "the named plaintiff has [(1)] antagonistic or conflicting

claims with other members of the class; or (2) has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) has counsel that is competent, qualified, experienced and able to vigorously conduct the litigation." *Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485, 490 (N.D. Ill. 2012) (quoting *Quiroz v. Revenue Prod. Mgmt., Inc.*, 252 F.R.D. 438, 442 (N.D. Ill. 2008)) (internal quotation marks omitted).

Here, both Plaintiff and proposed Class Counsel have and will continue to adequately represent the Settlement Class. Because Plaintiff suffered the same alleged injury as every other member of the Settlement Class—the collection and storage of her biometric data without her informed written consent during the class period (Compl. ¶¶ 25–30)—her interest in redressing Defendant's alleged violations of BIPA is identical to the interests of all other members of the Settlement Class. Thus, Plaintiff does not have any interests antagonistic to those of the Settlement Class. Consequently, Plaintiff's interests are entirely representative of and consistent with the interests of the Settlement Class.

For similar reasons, proposed Class Counsel are more than adequate to represent the Settlement Class. Proposed Class Counsel, Edelson PC, have extensive experience in litigating class actions of similar size, scope, and complexity to the instant action. Edelson PC is a national leader in high stakes plaintiffs' work ranging from class and mass actions to public client investigations and prosecutions. (*See* Firm Resume of Edelson PC, attached as Exhibit 2-A to the Ufkes Decl.) The firm filed the first-ever class action under BIPA against Facebook, *Licata v. Facebook, Inc.*, No. 2015-CH-05427 (Cir. Ct. Cook Cnty. Apr. 1, 2015), secured the first-ever adversarially-certified BIPA class in that case and defended the ruling in the Ninth Circuit, *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1277 (9th Cir. 2019) (upholding adversarial BIPA class certification), *cert. denied Facebook, Inc. v. Patel*, 140 S. Ct. 937 (2020), and obtained final

approval of a settlement agreement with Facebook to resolve the case for $650 million—the largest BIPA settlement to date, *In re Facebook Biometric Info. Priv. Litig.*, No. 15-cv-3747-JD, 2021 WL 757025, at *1 (N.D. Cal. Feb. 26, 2021) ("Overall, the settlement is a major win for consumers in the hotly contested area of digital privacy."). The firm is responsible for the first-ever BIPA settlement, too, *see Sekura v. L.A. Tan Enters., Inc.*, No. 2015-CH-16694, and has secured many favorable appellate decisions for BIPA plaintiffs. *Sekura v. Krishna Schaumburg Tan, Inc.*, 2018 IL App (1st) 180175 (pre-*Rosenbach*, holding violation of statute sufficient for plaintiff to be "aggrieved"); *Rottner v. Palm Beach Tan, Inc.*, 2019 IL App (1st) 180691-U (violation of statute sufficient to claim liquidated damages); *McDonald v. Symphony Bronzeville Park LLC*, 2022 IL 126511 (holding that the exclusivity provisions of the Illinois Workers' Compensation Act ("IWCA") do not bar employee BIPA claims against employers); *Sosa v. Onfido, Inc.*, 8 F.4th 631 (7th Cir. 2021) (affirming district court's denial of motion to compel arbitration).

The firm was recognized by Law360 in 2023 as a "Practice Group of the Year" for Cybersecurity and Privacy[4]—and was recognized for three years running as an "Illinois Powerhouse," alongside Kirkland & Ellis, Sidley Austin, Mayer Brown, Dentons, and Jenner & Block.[5] Edelson has been the only plaintiffs' firm, as well the only firm with fewer than 100

---

[4]     *Law360 Names Practice Groups of the Year*, LAW360 (Jan. 11, 2023), https://www.law360.com/articles/1562154; Parker Quinlan, *Cybersecurity & Privacy Group Of The Year: Edelson*, LAW360 (Feb. 21, 2023), https://www.law360.com/articles/1567512/cybersecurity-privacy-group-of-the-year-edelson.

[5]     Lauraann Wood, *Illinois Powerhouse: Edelson*, LAW360 (Sept. 3, 2019), https://www.law360.com/articles/1193728/illinois-powerhouse-edelson; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (Aug. 28, 2018), https://www.law360.com/articles/1076447/illinois-powerhouse-edelson-pc; Diana Novak Jones, *Illinois Powerhouse: Edelson PC*, LAW360 (October 5, 2017), https://edelson.com/wp-content/uploads/2016/05/Illinois-Powerhouse-Edelson-PC.pdf.

attorneys, to make the latter list. Proposed Class Counsel have diligently investigated and prosecuted the claims at issue and have dedicated substantial resources to the claims in this action and will continue to do so throughout its pendency. (Ufkes Decl. ¶ 8.)

Accordingly, because Plaintiff will fairly and adequately protect the interests of the class, and because she and the Settlement Class are amply represented by qualified counsel, the adequacy requirement is satisfied.

### E. A Class Action is a Superior Method of Resolving the Controversy.

Rule 23(b)(3) additionally requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy," considering class members' interests in individually controlling the prosecution of their claims, other litigation pending by or against class members, and the desirability of concentrating the litigation in the particular forum. A fourth consideration, whether any class trial would be manageable, is irrelevant here. *See Amchem*, 521 U.S. at 620 (noting that "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems…for the proposal is that there be no trial" but that the remaining prerequisites demand "undiluted, even heightened, attention").

First, given the relatively small damages awards available, individual class members have little interest in controlling the prosecution of their individuals claims. *See* 2 NEWBERG ON CLASS ACTIONS § 4:69 (6th ed. 2022) ("representative litigation is superior" when class members' claims "may be so small that it would be a waste of their time and/or resources to litigate individually"). *In re Facebook Biometric Info. Priv. Litig.*, 326 F.R.D. 535, 549 (N.D. Cal. 2018) ("While not trivial, BIPA's statutory damages are not enough to incentivize individual plaintiffs

16

given the high costs of pursuing discovery on Facebook's software and code base and Facebook's willingness to litigate the case.").

Second, there are no other cases pending against Puma, which is powerful evidence that individual class members lack a sufficient incentive to go it alone. *See* 2 NEWBERG ON CLASS ACTIONS § 4:70 (6th ed. 2022). And, given Plaintiff's allegation that Puma did not institute any BIPA-specific policies or develop written materials for individuals addressing their statutory rights prior to collecting their fingerprints, (Compl. ¶¶ 22–23), it's likely that "many class members may be unaware of their rights under [BIPA]." *Bernal v. NRA Grp. LLC*, 318 F.R.D. 64, 76 (N.D. Ill. 2016). Both considerations support the notion that class members' interests in individual suits is minimal. *Id.*

Finally, it is desirable to concentrate the litigation—and to undergo the settlement approval process—in this forum, *see* Fed. R. Civ. P. 23(b)(3)(C), given that this case concerns a proposed class of plaintiffs who scanned their fingers at Puma locations throughout Illinois. *See Rogers v. BNSF Ry. Co.*, No. 19 C 3083, 2022 WL 854348, at *4 (N.D. Ill. Mar. 22, 2022) ("consolidating these [BIPA] claims in this forum is particularly appropriate given BIPA is an Illinois statute, and the alleged violations all occurred within Illinois."). Rule 23's superiority requirement is satisfied.

### F.    The Class Is Ascertainable.

Finally, the proposed Settlement Class definition meets Rule 23's implicit requirement of "ascertainability," which requires that a class "be defined clearly and based on objective criteria." *Mullins*, 795 F.3d at 659. "Whether a class is ascertainable depends on 'the adequacy of the class definition itself,' not 'whether, given an adequate class definition, it would be difficult

to identify particular members of the class,'" although Plaintiff here would meet both standards. *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 581 (N.D. Ill.) (citing *Mullins*, 795 F.3d at 658).

Here, the Settlement Class definition is based solely on objective criteria: either an individual (i) used a finger scanner at a Puma facility in Illinois during the relevant time period, (ii) without first executing Defendant's consent form, and (iii) without signing an arbitration agreement with Defendant, or they did not. (Agreement § 1.22.) Moreover, Settlement Class members can be readily identified through Puma's records. (*See* Paquett Decl. ¶ 4.) Because the class is "defined clearly [and] membership [is] defined by objective criteria," it is ascertainable. *Mullins*, 795 F.3d at 657.

For these reasons, maintenance of this action as a class action is appropriate. The Court should therefore certify the Settlement Class for settlement purposes.

## V.     PLAINTIFF'S COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [with the] ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the court considers proposed class counsel's: (1) work in identifying or investigating the potential claim, (2) experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) knowledge of the applicable law, and (4) resources that it will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv).

As discussed above,[6] proposed Class Counsel have extensive experience in litigating

---

[6]     Courts frequently analyze counsel's adequacy under both Rule 23(a)(4) and Rule 23(g), which is why it is discussed twice here. 1 NEWBERG ON CLASS ACTIONS § 3:56 (5th ed. 2011); *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592–93 (7th Cir. 2011), *as modified* (Sept. 22, 2011) (reviewing counsel's adequacy under Rule 23(a)(4) but mentioning the Rule 23(g) factors in its analysis).

consumer privacy class actions in general, and BIPA class actions specifically; have thoroughly investigated the claims at issue; and have the resources necessary to conduct this litigation. (*See* Ufkes Decl. ¶ 8.) And because of their efforts here, proposed Class Counsel have secured a Settlement that provides extraordinary monetary relief to the Settlement Class and the prospective relief necessary to protect privacy interests going forward. Thus, the Court should appoint J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC as Class Counsel.

## VI.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

In addition to showing that the Settlement Class is certifiable, the parties must also show that the Court "will likely be able to … approve the [settlement] proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). Rule 23(e)(2) requires the Court to find that the settlement is "fair, reasonable, and adequate" after considering whether: (A) the class representative and class counsel have adequately represented the class; (B) the settlement was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).[7] The proposed Settlement in this case— which creates a $177,800 non-reversionary fund for the 127 class members and ensures Puma will comply with BIPA going froward—easily satisfies these factors.

---

[7]    These factors were codified into Rule 23 in 2018, and notably, they significantly "overlap with the factors previously articulated by the Seventh Circuit, which include: (1) the strength of the plaintiff's case compared to the terms of the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the presence of collusion in gaining a settlement; (5) the stage of the proceedings and the amount of discovery completed." *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *2 (S.D. Ill. Dec. 16, 2018) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)); *see also* Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). For this reason, decisions prior to the Amendment can still provide guidance to the Court.

### A. Plaintiff Joselyn Ramos and Proposed Class Counsel Have Adequately Represented the Settlement Class.

The first Rule 23(e)(2) factor considers whether the class representative and class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). The focus of this analysis is "on the actual performance of counsel acting on behalf of the class" throughout the litigation and in settlement negotiations. Fed. R. Civ. P. 23(e) Advisory Committee's Note to 2018 Amendment; *see Gumm v. Ford*, No. 5:15-cv-41-MTT, 2019 WL 479506 at *3 (M.D. Ga. Jan. 17, 2019). In considering this factor, courts are to examine whether plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account (i) the nature and amount of discovery completed, whether formally or informally, and (ii) the "actual outcomes" of other, similar cases. Fed. R. Civ. P. 23(e) Advisory Committee's Note to 2018 Amendment. Ultimately, this factor is generally satisfied where the named plaintiff participated in the case diligently, and where class counsel fought hard on behalf of plaintiff and the class throughout the litigation. *See Snyder v. Ocwen Loan Servicing, LLC*, No. 14 c 8461, 2019 WL 2103379, at *4 (N.D. Ill. May 14, 2019).

Here, Plaintiff Ramos has been involved in nearly every aspect of this case, including helping her attorneys investigate her BIPA claims, preparing and reviewing the Complaint before filing, conferring with her counsel throughout the litigation, and reviewing and approving the Settlement Agreement before signing it. (Ufkes Decl. ¶ 9.) Without Ms. Ramos stepping up to represent the class and taking on these tasks as the lead plaintiff, the relief secured for the Settlement Class wouldn't have been possible. Given her efforts and aligned interest with the class, there can be no doubt that Ms. Ramos has only acted in the best interest of the Settlement Class and has adequately represented them.

20

Likewise, proposed Class Counsel's performance in this case demonstrates that their representation has been beyond adequate, especially when considering (i) the investigation and discovery conducted and (ii) the benefits of the Settlement compared to similar privacy settlements, including those under BIPA. First, the considerable amount of investigation and discovery completed by Plaintiff's counsel ensured that they had adequate information to assess the strength of the case and engage in settlement discussions. *See Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 WL 3290302, at *8 (N.D. Ill. July 26, 2011) (the standard "is not whether it is conceivable that more discovery could possibly be conducted" but whether the court and parties have enough information "to evaluate the merits of this case"). Prior to filing this case, Plaintiff's counsel investigated Puma and the technology—provided by Kronos Incorporated—it used to allegedly collect the class members' fingerprint data. (Ufkes Decl. ¶ 2.) Once the case was filed, Plaintiff's counsel pressed forward with formal written discovery as soon as possible. To aid in their settlement negotiations, the Parties also exchanged informal discovery concerning the size and composition of the class, Puma's notice and consent forms related to biometric data, and Puma's form arbitration agreement. (*See id.* ¶ 3.) Put simply, the facts underlying Plaintiff's allegations in this case, though by no means their legal import, are now substantially undisputed: 127 Puma employees, including Plaintiff, scanned their fingers to clock in and out of work at Puma's Illinois facilities on a timeclock system provided by Kronos, the data resulting from those finger scans was stored on the timeclocks, and Puma did not seek informed written consent from those 127 employees or establish a publicly available retention and deletion policy before those employees scanned their fingers. *See In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350 (N.D. Ill. 2010) (approving settlement where "the focus of th[e] litigation appears to be more on legal than factual issues, and there is

no indication that [more] formal discovery would have assisted the parties in devising the [p]roposed [s]ettlement [a]greement.").

In short, the issues in this litigation have crystallized sufficiently for Plaintiff and her counsel to assess the strengths and weaknesses of their negotiating position (based upon the litigation to date, the anticipated outcomes of oral fact discovery and expert discovery, and additional motion practice) and evaluate the appropriateness of any proposed resolution. *See Kaufman v. Am. Express Travel Related Servs., Co.*, No. 07-CV-1707, 2016 WL 806546, at *10 (N.D. Ill. Mar. 2, 2016) (concluding that "extensive formal discovery, when measured against the cost that would be incurred," would not place the parties in a better position than they are now to determine an appropriate settlement value).

Second, the Settlement achieved by Plaintiff's counsel excels in comparison to other statutory privacy settlements, including BIPA settlements, both in terms of monetary relief and ease of administration. Puma has agreed to settle this case for $177,800 for a class of approximately 127 individuals that will be split equally between Class Members, with no reversion to Puma. (*See* Agreement § 1.24.) Instead of paying only a fraction of class members who take the time to submit a claim, if the Settlement is approved, *each and every* Settlement Class Member will be sent a *net* payment (meaning after all fees and costs are deducted) of about $740 without having to submit a claim.

This amount dwarfs the amounts recovered in many other statutory privacy class actions, which all too often produce no relief to the class or only cy pres relief. *See, e.g.*, *In re Google LLC Street View Elec. Commc'ns Litig.*, No. 10-md-02184-CRB, 2020 WL 1288377, at *11–14 (approving, over objections of class members and state attorney general, a settlement providing only *cy pres* relief for violations of Electronic Communications Privacy Act, where $10,000 in

statutory damages were available per claim); *Adkins v. Facebook, Inc.*, No. 18-cv-05982-WHA, dkts. 350, 369 (N.D. Cal. May 6, 2021 and July 13, 2021) (approving settlement for injunctive relief only in class action arising out of Facebook data breach and granting $6.5 million in attorneys' fees and costs). Some BIPA settlements, too, have depressed the amount defendants have to pay with credit monitoring, a needless—in the employment context—claims process, caps on the amount claiming class members can recover, and reversion of unclaimed funds. *E.g.*, *Carroll v. Crème de la Crème, Inc.*, 2017-CH-01624 (Cir. Ct. Cook Cnty. June 6, 2018) (credit monitoring only); *Zhirovetskiy v. Zayo Grp., LLC*, 2017-CH-09323 (Cir. Ct. Cook Cnty. Apr. 8, 2019) (fund of $990,000 for 2,200 class members, which provided capped payments of $400 *only* to those who submitted a claim and reverted up to $490,000 of unclaimed funds back to defendant); *Marshall*, 2017-CH-14262 (providing $270 *only* to those who submitted a claim).

The leading BIPA settlements in the employment context—like this one—do not require a claims process at all, and instead distribute funds equally and directly to all class members. Even compared against those settlements, this Settlement's $177,800.00 fund for 127 class members provides among the highest relief per person in a BIPA case to date. *See Kane v. ConTech Lighting*, 2018-CH-12194 (Cir. Ct. Cook Cnty. Aug. 14, 2020) ($164,400 fund for 137 class members); *Cornejo*, No. 18-cv-07018, dkt. 57 ($175,000 fund for 125 class members); *Montgomery v. Peri Framework Sys., Inc.*, No. 20-cv-07771, dkt. 33 (N.D. Ill. Nov. 9, 2021) ($165,000 fund for 110 class members).

Finally, aside from the monetary relief, the non-monetary benefits created by the Settlement also demonstrate Plaintiff's and proposed Class Counsel's outstanding representation of the class. (*See* Agreement § 2.2.). To the extent Puma uses biometric timekeeping technology going forward, Puma has agreed to establish, maintain, and make publicly available a retention

and destruction schedule for biometric data and obtain the requisite informed consent from employees who work at its Illinois facilities before they can scan their finger. (*Id.*) Under the Settlement, Puma has also formally agreed to destroy all biometric data within its possession collected from former employees in Illinois. (*Id.*) This prospective relief aligns perfectly with both the goals of BIPA and those of this lawsuit, as it will ensure that past, current, and future employees of Puma in Illinois are protected as the legislature intended.

If the Settlement is approved, the Settlement Class will reap its valuable benefits thanks to Plaintiff's and proposed Class Counsel's hard work pursuing this case and representing their interests. This factor is well satisfied.

## B. The Settlement Was Reached as a Result of Arm's-Length Negotiations Between the Parties.

The second Rule 23(e)(2) factor looks to whether the parties negotiated the settlement at arm's-length. Fed. R. Civ. P. 23(e)(2)(B). The answer here is easy: yes. The Parties exchanged formal and informal written discovery, briefed Puma's motion to stay, participated in a formal mediation session, and engaged in multiple rounds of negotiations over the course of several months before finally reaching the Settlement—which provides extraordinary relief to every member of the Settlement Class. (*See* dkt. 53.) *See Wright v. Nationstar Mortg. LLC*, No. 14 C 10457, 2016 WL 4505169, at *11 (N.D. Ill. Aug. 29, 2016) (finding no collusion or unfairness where "the parties have vigorously defended their positions throughout the litigation, participated in two prior mediations, and engaged in discovery" prior to reaching settlement). To ensure well-informed negotiations, Puma informally provided Plaintiff information regarding the size and composition of the class before any negotiations occurred. (Ufkes Decl. ¶ 3.) These negotiations led to a half-day, private meditation with Honorable James F. Holderman (Ret.) of JAMS Chicago on May 12, 2022. (*Id.* ¶ 6.) Unable to reach resolution during the mediation, the case

proceeded and remained stayed. It wasn't until eight months later that the Parties revisited their settlement discussions again, in advance of the Illinois Supreme Court's scheduled ruling in *Tims v. Blackhorse Carriers*. (*Id.* ¶ 7.) After these continued negotiations, the Parties reached an agreement in principle on February 1, 2023. (*Id.*) The Parties negotiated the remaining material terms of the settlement over the next several days and executed a binding Memorandum of Understanding on February 6, 2023. (*Id.*) The Parties then spent the next several weeks drafting and negotiating the finer deal points of the final written agreement, resulting in a sharply-negotiated Settlement Agreement that was executed on March 28, 2023. (*Id.*; *see* dkt. 53.) *See Young v. Rolling in the Dough, Inc.*, No. 17-cv-07825, 2020 WL 969616, at *4 (N.D. Ill. Feb. 27, 2020) (finding the settlement agreement is "clearly" the product of arm's-length negotiations after it was agreed to after a contested motion, extensive discovery and discovery disputes, and a settlement conference).

The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to all Settlement Class Members, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Snyder*, 2019 WL 2103379, at *4 (approving settlement where "there is no provision for reversion of unclaimed amounts, no clear sailing clause regarding attorneys' fees, and none of the other types of settlement terms that sometimes suggest something other than an arm's-length negotiation").

For these reasons, there should be no question that the Settlement here was the result of good-faith, arm's-length negotiations and is entirely free from fraud or collusion. *See Schulte v. Fifth Third Bank*, No. 09-CV-6655, 2010 WL 8816289, at *4 n.5 (N.D. Ill. Sept. 10, 2010) (noting that courts "presume the absence of fraud or collusion in negotiating the settlement,

unless evidence to the contrary is offered").

### C. The Settlement Treats All Settlement Class Members Equally.

The next Rule 23(e)(2) factor considers whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Here, given that each Class Member has nearly identical BIPA claims for monetary and injunctive relief against Puma, the proposed Settlement treats each of them identically. In terms of monetary relief, Puma has agreed to create a $177,800.00 non-reversionary Settlement Fund, from which each Class Member will receive a single, *pro rata* cash payment. (Agreement §§ 1.24–1.25, 2.1); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (where class members are similarly situated with similar claims, equitable treatment is "assured by straightforward pro rata distribution of the limited fund"). The Settlement also provides for identical prospective relief requiring Puma (to the extent it uses biometric timekeeping technology going forward) to maintain a BIPA-compliant retention policy for biometric data, destroy biometric data in compliance with that policy, and provide BIPA-compliant notice and consent forms to employees at its Illinois facilities and require them to be executed, all in a uniform manner. (Agreement § 2.2.) Further, each Class Member will release the same BIPA claims against Puma and won't release any claims against Kronos. (*Id.* §§ 1.17–1.19, 3.1.) Because the Settlement treats each member of the Settlement Class equally, this factor is well satisfied.

Likewise, the provision of a service award to Ms. Ramos for serving as Class Representative is consistent with the equitable treatment of class members. The requested $5,000 service award appropriately reflects the work she's done for the Settlement Class, which as described above, included helping her attorneys investigate her and the class's claims, preparing and reviewing the pleadings, conferring with her counsel regularly, and reviewing the Settlement

Agreement. Moreover, an award of this size is squarely in line with, and in many instances lower than, other service awards given to class representatives in BIPA cases. *See Lopez-McNear v. Superior Health Linens, LLC*, No. 19-cv-2390, dkt. 69 (N.D. Ill. Apr. 27, 2021) (Pallmeyer, J.) ($5,000 service award); *Martinez*, No. 19-cv-07012, dkt. 63 ($7,500 service award) (Ellis, J.); *Dixon v. Washington & Jane Smith Cmty.-Beverly*, No. 17-cv-8033, dkt. 103 (N.D. Ill. May 31, 2018) ($10,000 service award) (Kennelly, J.). Given that Ms. Ramos' efforts were key to securing the outstanding relief provided by the Settlement, the modest proposed service award is fully consistent with equity.

**D.     The Relief Secured for the Settlement Class Is Adequate and Warrants Approval.**

The final and most substantive factor under Rule 23(e)(2) examines whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination, Rule 23 instructs courts to consider several sub-factors, including (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreements made in connection with the proposed settlement. *Id.* As explained below, each of these sub-factors demonstrate that the relief provided by the Settlement is excellent—well beyond adequate—and should be approved.

**1.     The cost, risk, and delay of further litigation compared to the Settlement's benefits favors final approval.**

In evaluating the adequacy of the relief provided to the class, courts should first compare the cost, risks, and delay of pursing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 Amendment.

The Settlement here warrants approval because it provides immediate relief to the Settlement Class while avoiding potentially years of complex litigation and appeals and the risk

that comes along with it. *Goldsmith v. Tech. Sols. Co.*, No. 92 C 4374, 1995 WL 17009594, at *4 (N.D. Ill. Oct. 10, 1995) ("As courts recognize, a dollar obtained in settlement today is worth more than a dollar obtained after a trial and appeals years later."). At the time the Parties reached an agreement in principle, there were two appeals pending in the Illinois Supreme Court in BIPA cases on two issues of first impression (in *Tims v. Black Horse Carriers, Inc.*, 2023 IL 127801 and *Cothron v. White Castle System, Inc.*, 2023 IL 128004, respectively) that if decided in Puma's favor, would have extinguished many of the class members' claims in this case and denied them relief altogether. Although the Illinois Supreme Court ultimately decided these issues in Plaintiff's favor just a few months ago—finding in *Tims* that a five-year limitations period applies to all BIPA claims and finding in *Cothron* that BIPA claims start to accrue after the last collection of biometric data—settling when the Parties did eliminated the risk of an unfavorable ruling.

But the *Cothron* decision still presents risk because it cuts both ways. On one hand, it was decidedly plaintiff-friendly on the accrual issue and in determining that every scan and transmission violates the Act. 2023 IL 128004 ¶ 40. But the Court also introduced the possibility that a trial court could adjust damages in its discretion. *Id.* ¶ 42. Thus, Plaintiff continued to incur risks of continued litigation, even if they had won on class certification and on liability at trial. In light of the continued risk of litigation, the Settlement is exceptional.

Additionally, as to the merits of the case, Puma (like nearly every other BIPA defendant) was likely to argue that the information captured by its fingerprint scanners were not actually "biometric identifiers" or "biometric information" subject to BIPA, but some third category of finger scan information outside of BIPA's purview. Plaintiff puts little stock in this argument,

28

but it would need to be defeated at summary judgment or trial and remains an issue ungoverned by precedent.

Likewise, the Parties also would have been forced to litigate the issue of class certification adversarially. *See* Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 Amendment (instructing courts to consider the likelihood of certifying the class for litigation in evaluating this sub-factor); *see also Hudson v. Libre Tech., Inc.*, No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060, at *6 (S.D. Cal. 2020) ("Proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class…"). Although Plaintiff believes this case is amenable to class certification given Defendant's uniform conduct, *see Palacios v. H&M Hennes & Mauritz, LP*, No. 18-CH-16030 (Cir. Ct. Cook Cnty. Mar. 16, 2023) (attached hereto as Exhibit 4) (certifying class of employees who enrolled defendant's finger-scan timekeeping system), and that she would ultimately prevail on certification issues, that process is by no means risk-free. This Settlement provides excellent relief to the Class Members now, avoiding years of delay to resolve these questions.

Even if Plaintiff had succeeded at class certification, summary judgment and/or trial, Plaintiff expects that Defendant would have re-raised its arguments requesting a reduction in damages based on due process in light of the significant potential statutory damages at issue. (Dkt. 32 at 21); *see, e.g.*, *Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) (statutory award in TCPA class action of $1.6 billion reduced to $32 million); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022) (in TCPA case, vacating district court's denial of defendant's post-trial motion challenging the constitutionality of $925 million statutory damages award under TCPA and remanding for further proceedings); *but see U.S. v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020), *cert. dismissed*, 141 S. Ct. 729 (2021) (statutory award of

$280 million for violating various telemarketing statues over 65 million times did not violate due process). Given the significant exposure that Puma faced—especially after *Cothron* clarified that plaintiffs can recover damages for *each* scan and transmission of biometric data—it is an essentially foregone conclusion that these issues would be pressed on appeal, further delaying relief.

Protracted litigation would also consume significant resources, including the time and costs associated with continued written discovery, oral discovery, securing expert testimony on complex biometric and data storage issues, and again, motion practice, trial, and any appeals. It is possible that "this drawn-out, complex, and costly litigation process . . . would provide Class Members with either no in-court recovery or some recovery many years from now…" *In re AT & T Sales Tax Litig.*, 789 F. Supp. 2d 935, 964 (N.D. Ill. 2011). Because the proposed Settlement offers immediate—and substantial—monetary relief to the Settlement Class while avoiding the need for extensive and drawn-out litigation, preliminary approval is appropriate. *See*, *e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.").

### 2. The method of distributing relief to the Settlement Class Members is effective and supports preliminary approval.

The next sub-factor evaluates whether the settlement's proposed method of distributing relief to the class is effective. Fed. R. Civ. P. 23(e)(2)(C)(ii). An effective distribution method "get[s] as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible" while also ensuring that only "legitimate claims" are paid. 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed. 2011). The proposed Settlement here does just that by sending checks directly to each Settlement Class Member by default, without the need to submit a claim form, meaning *every* Settlement Class Member will receive a cash payment.

(Agreement §§ 1.25, 2.1.) The Settlement Website lets Class Members update their address where the check will be sent and also allows them to receive their Settlement Payment by Venmo, Zelle, or Paypal, instead of a check. (*Id.* §§ 1.26, 2.1(b).) *See Cornejo* No. 18-cv-07018, dkt. 57 (granting final approval of BIPA settlement similarly providing settlement payments directly to class members). There can be no doubt that the proposed settlement administration plan is the most effective and feasible method of distributing monetary relief to the Class Members.

### 3. The terms of the requested attorneys' fees are reasonable.

The third and final relevant sub-factor[8] considers the adequacy of the relief provided to the class taking into account "the terms of any proposed award of attorney's fees, including timing of payment…" Fed. R. Civ. P. 23(e)(2)(C)(iii). If the Settlement is preliminarily approved, proposed Class Counsel plans to petition the Court for an award of reasonable attorneys' fees after the Settlement Class has received notice of the Settlement. The Settlement's contemplated method of calculating attorneys' fees (i.e., the percentage-of-the-fund method), and its limit on attorneys' fees (i.e., no more than 35% of the non-reversionary Settlement Fund) is reasonable and predicated on the outstanding relief provided to the Settlement Class. (Agreement § 8.1.) To be sure, the percentage-of-the-fund method has been used to determine a reasonable fee award in every BIPA class action settlement creating a common fund to date (to Class Counsel's knowledge), and a 35% award will adequately capture the hypothetical *ex ante* agreement that the Settlement Class would have entered into with proposed Class Counsel had

---

[8] The fourth sub-factor, which requires the parties to identify any side agreements made in connection with the settlement, Fed. R. Civ. P. 23(e)(2)(C)(iv), is not applicable here as the written Settlement Agreement provided to the Court represents the entirety of the Parties' proposed Settlement. (Ufkes Decl. ¶ 10.) Since there are no side agreements to be identified, this sub-factor weighs in favor of preliminary approval.

they sought them out in the market, given the risks in the case. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011); *e.g.*, *Alvarado v. Int'l Laser Prods., Inc.*, No. 18-cv-7756, dkt. 70 (N.D. Ill. Jan. 24, 2020) (awarding 35% of fund); *Neals v. ParTech, Inc.*, No. 19-cv-05660, dkt. 140 (N.D. Ill. July 20, 2022) (awarding 35% of fund); *Cornejo*, 18-cv-07018, dkt. 57 (awarding 35% of fund); *Lark, et al v. McDonald's USA, LLC, et al.*, No. 17-L-559 (Cir. Ct. St. Clair Cnty. Feb. 28, 2022) (awarding 37% of fund); *Prelipceanu v. Jumio Corp.*, 2018-CH-15883 (Cir. Ct. Cook Cnty. July 21, 2020) (awarding 40% of fund); *Marshall*, 2017-CH-14262 (awarding 47% of fund). Accordingly, that the Settlement permits the Court to award 35% of the net Settlement Fund (that is, after deducting all Settlement Administration Expenses and the incentive award) in attorneys' fees is more than appropriate.[9] Proposed Class Counsel will submit their lodestar to the Court when moving for an award of attorneys' fees so the Court may "cross check" any percentage fee award.

Furthermore, there is no "kicker" clause here; any amount less than 35% awarded by the Court will remain available for distribution to the Class Members. And there is no "clear sailing" clause—Puma may oppose any request for attorneys' fees. The Court's review of any petition for fees will ensure that Class Counsel do not receive an outsize share of the relief offered to the Settlement Class. Finally, if approved, the Settlement provides that attorneys' fees will be paid within five business days after final judgment, including any appeals. (Agreement § 8.1.) These terms are reasonable and should be preliminarily approved.

For these reasons, Plaintiff and proposed Class Counsel submit that the monetary and prospective relief provided by the Settlement weighs heavily in favor of a finding that it is fair,

---

[9]     To be clear, Defendant may oppose the amount of attorneys' fees requested by proposed Class Counsel, as there is no "clear-sailing" provision in the Agreement. (Agreement § 8.1.)

reasonable, and adequate, and well within the range of possible approval. The Court should grant preliminary approval.

## VII.  THE PROPOSED NOTICE PLAN SHOULD BE APPROVED IN FORM AND SUBSTANCE

Rule 23 and Due Process require that for any "class proposed to be certified for purposes of settlement under Rule 23(b)(3)[,] the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). Rule 23(e)(1) similarly provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a [proposed settlement, voluntary dismissal, or compromise.]" Fed. R. Civ. P. 23(e)(1). Notice may be provided to the class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (eff. Dec. 1, 2018). The substance of the notice to the class must describe in plain language the nature of the action, the definition of the class to be certified, the class claims and defenses at issue, that class members may enter an appearance through counsel if so desired, that class members may request to be excluded from the class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

Here, the Settlement contemplates a multi-part notice plan. First, Defendant has already provided the Settlement Administrator—Simpluris, Inc.—with a class list that includes the names and last known U.S. Mail addresses of all 127 Settlement Class members, and additionally includes an email address for 119 of them. (Agreement § 4.1(a).) The Settlement Administrator will update Class Members' physical addresses using the National Change of Address database to ensure the most up-to-date addresses as possible. (*Id.* § 4.1(b).) The Settlement Administrator will then send direct Notice via First Class Mail to all physical

addresses on the Class List and via e-mail to all class members for whom a valid e-mail address is available. (*Id.* § 4.1(b)(ii); *see* Agreement Exhibits A and B).

To ensure a comprehensive notice, the mailed and e-mailed Notice will direct class members to a Settlement Website, which will provide class members 24-hour access to further information about the case, including important court documents and a detailed "long-form" Notice document, will allow Class Members to select an electronic payment method (like Venmo, Zelle, or PayPal) instead of a check, and will allow Class Members to update their address to ensure checks are sent to the correct addresses. (*Id.* § 4.1(b)(iii); *see* Agreement Exhibit C.) Supporting the direct Notice and Settlement Website will be a toll-free telephone line through which class members can contact the Settlement Administrator or Class Counsel to obtain additional information about the Settlement. All of the Notice correspondence and Settlement Website content is written in plain, easy-to-read language, designed to be easily understood by class members. Finally, Defendant will provide notice of the Settlement to the appropriate state and federal officials as required by the Class Action Fairness Act, 28 U.S.C. § 1715. (*Id.* § 4.1(b)(iv).)

Because the proposed Notice Plan effectuates direct Notice to all Settlement Class Members reasonably identified through Puma's records and fully apprises Settlement Class members of their rights, it comports with both Rule 23 and Due Process. Consequently, the Court should approve the Parties' proposed Notice Plan.

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order (i) granting preliminary approval of the Parties' proposed Class Action Settlement Agreement, (ii) certifying the proposed Settlement Class for settlement purposes, (iii) directing that notice be provided to persons the Settlement Classes pursuant to the Notice Plan set forth in the Settlement

Agreement, (iv) appointing Plaintiff Joselyn Ramos as Class Representative, (v) appointing J. Eli Wade-Scott and Schuyler Ufkes of Edelson PC as Class Counsel, (vi) scheduling a final fairness hearing in this matter, and (vii) providing such other and further relief as the Court deems reasonable and just. Plaintiff will submit a proposed Preliminary Approval Order for the Court's convenience and to propose future case deadlines.

Respectfully submitted,

**JOSELYN RAMOS** individually and on behalf of all others similarly situated,

Dated: April 17, 2023

By: /s/ Schuyler Ufkes
      One of Plaintiff's attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Schuyler Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378